Will the attorneys who are going to argue the case please introduce yourselves and indicate to the court how much time you'd like to make your argument? Good morning Judge. My name is Ziad Al-Makid. First name is spelled Z-I-A-D. Last name is A-L-N-A-Q-I-D. And if it pleases the court I'd like to take about 12 minutes to start the case and reserve about 3 minutes in case I need some rebuttal. Alright. Thank you. Good morning Your Honor. This is Assistant State's Attorney Anthony O'Brien for the people. How much time Mr. O'Brien? No more than 15 minutes Your Honor. Thank you. Counsel. If it pleases the court. Your Honors, by my calculations it's about I think next year's the 30 year anniversary of Batson v. Kentucky. A case that I think we're all very familiar with that was ruled upon to make a challenge to peremptory strikes against racial minorities a little easier. And even though we've been doing this for 30 years, I would suggest to the court that we're still struggling with some of the same issues that we were back then, although we have made some headway. In this particular case, the case of Lendell Williams, I believe that some very serious issues were brought before the trial court regarding the Batson issue. Now I'm also going to touch upon it, and again if it pleases the court, on the second issue of my brief, which is the limitation on a prior crime earlier in the same day that deals with the issue of presenting alternative suspect or third party guilt. So I'll start with the Batson issue. Your Honor, in this particular case there was a murder trial that took place and that the jury selection for that murder trial. We know the facts. Okay. Under Batson, we look at the totality of the facts. Absolutely. Well, how can we, if you look at the totality, you have the first 14. Correct. And then you have two more series. Correct. And then you have two more veneer men, or veneer persons. So how, you're looking at just the first, and that's my problem. How do we get over that problem when the court has made it so clear over and over? Your Honor, I think I do it in a number of ways. And I will state that I will concede that it would have been more optimal had the demographics of the rest of the veneer, the other two, as you say, had been clearly stated out. But I think we can get there anyway. And I think in the case of Peoples v. Gaston, they recognized that there were some shortcomings in the preservation of the demographics of that record. But they said that you could still do this. And they said that you could still do it because the trial attorney made a very specific record about who the state challenged, their racial makeup, and the numbers at the time of this. And I understand that we have an issue, and I'm going to address that, Your Honor. I think it's a very important issue. We know in that first 14 that the first four African American people that came before the jury were struck. We know this because everyone agreed upon it. The first four African Americans that came before the court were struck by the state using peremptory challenges. A fifth one, after the defense counsel raised the Batson challenge, was then accepted by the state. So how does the court then look at the next two panels? And I will say this, Judge. At the post-trial motion, the counsel for the state made an interesting argument, an argument that said that they sat, and I'll use their terms, six jurors of color. This is the first time the terminology of color had been used during the course of the trial. As a matter of fact, it's the only time that they used it in either, I never used it, and the state, even in their response brief, used it only in quoting that scenario. And I would argue to the court that the very fact that that attorney chose not to say we sat six African Americans or six blacks on the jury is an indication that he can't do it. And the reason he can't do it and the reason he does say six jurors of color is because he's using it as a term of art, a euphemism for any non-white individual. Were there six non-whites on the jury? I believe that based on that statement, there were six non-whites on the jury. And I would say that counsel for the defense at that time did not dispute that, did not step up and say there's six. The one thing I will say, again, the terminology of color refers to any non-white individual. Of the six, how many were black? One. There was one black juror at the end of the day. And we know this by reason of that particular colloquy that occurred. I'm sorry if I'm moving around. So you're saying there were five non-white, non-African American jurors? Absolutely. Yes. And I say that because if they had sat five more or six total African Americans, we're only dealing with the race of African Americans. We aren't dealing with Arab Americans, Hispanic Americans, Chinese Americans. We're only dealing with that one race. And if they had sat six African Americans, what's the most explicit thing, the most surefire way that they could have achieved knowledge to everybody that that's what happened, is they would have said we sat six African Americans. Doesn't it have the burden of preserving the record? Absolutely. We don't know. I mean, you say you're surmising it's because they used the word color rather than African American or some other designation. But we don't know that. And that's part of the problem we're having. It's a good problem, Judge. And as I said before, I concede that this isn't optimal. But because what we're left with is a record and a situation where a pattern did exist, at least through that first 14, I don't think there's a dispute. I mean, if you're going to start the first four and then accept only the fifth after a bouts in his race, it raises the inference that this is being done by reason or motivated by race. But you would acknowledge the record is incomplete, correct? I think that's a fair statement, Judge. And I don't want to be someone who stands up here and dances on the head of a pen and tells you this. But I do want to stress that even the court, the trial court itself, at that post-trial motion, when it ruled on the colloquy that I just discussed about them seeing six jurors of color, she didn't say, oh, and yes, there were six African Americans in the jury. She didn't say that. She just said, my prior ruling at the time of that initial stage after the first 14 stands. Now, there is no guarantee that I'm correct. I accept that. But I will say that based on what I was able to surmise from the record, I would argue that from what we have, I would argue that one African American, we are sure, sat on that jury. There is no indication that any other African Americans sat on that jury unless we want to use the term of color in a euphemistic way that I don't want to use. One of the arguments made by the state is that of the four, I think three were teachers, single, and I think the fourth had education, too. So were there any other teachers? What kind of record do we have to deal with? Right. Thank you. And I understand Your Honor saying how are we going to compare that to – well, I don't think, and I would just submit that I don't think we get there yet. We are at a stage where the only determination that we were trying to make is that there is a prima facie case of discrimination. That initial stage, you don't make a comparison to the non – or excuse me, the white members or Caucasian members of the jury. You don't do that until after you have surpassed that initial prima facie stage. At the prima facie stage, you are just comparing the heterogeneity of the actual, in this case, of the four African Americans that were struck, and you can compare that with the one that was accepted. But why should we just look at the first round and not look at the second and third round when we are supposed to look at the totality of the facts, look at the totality of circumstances, what actually went on here. And that was another reason. Early on, there wasn't much discussion when that objection was made. There wasn't much said. There was no – it was all bubble. There was no filigree. And later on, there isn't much said. I think the brief – the motion had two sentences. Yeah. So, you know, how do you say, well, we can only look at the first round and not look at what happened in the second and third rounds, which we have very little information that was preserved. Again, I – I mean, what are we guessing? I mean, this is – how can we do that when we have to make a lot of expectations? Yeah. Let me add one thing because I think it's something you really touched upon. In the case of Hooper v. Ryan, which was the Federal Seventh Circuit case that Judge Easterbrook authored, he made some commentary in that that cautioned us against relying overly on, as you say, all this relevant circumstance, the totality of circumstances. And he did it because he said that Batson, when it was ruled, did not change the structure to the point that they said statistics alone are enough. They just expanded it, saying don't just rely on statistics. But he – Easterbrook – I think Justice Easterbrook stated that statistics sometimes can be enough alone. And in this particular instance, when you have four or five, even though it's just that very first panel, you have – it's a difficult proposition to say that that wasn't a disproportionate – they all – excuse me – a disproportionate use of their strikes. Remember, they only had seven. So at that point, Your Honor, it's after that very first 14, that first panel, they only had two more left. They already used five. Seventy percent of their strikes had already been used. So it's not as if there was going to be a whole bunch more strikes that they were going to be able to use against anyone. Again, I wish. I wish that there was a fly on the wall and a video camera that showed us this stuff. But it isn't there, and I'm not going to sit here and try to claim to you that there isn't. But I do believe there is things in the record that Your Honors, that I was able to surmise, that I would ask Your Honors to surmise. And I don't think it's just assumption. I think we can make some logical, educated hypotheses, educated guesses. It's not guessing in a purely chance way. Your Honors, I would also add that – and obviously you've read the brief and you know the statistics that continue on there. I think that the statistics can speak for themselves. The other relevant circumstances that I think apply here is that the defendant, Lendell Williams, was African American. And it's the same race we're dealing with in terms of the strike. There isn't a lot to go on in terms of the prosecutor's Q&A because the voir dire was conducted by the court. Although I will say, again, if you want to use the euphemism of color as being only African American, I think you sort of start to tread on very dangerous ground in saying that it's a word synonymous with colors. And if he had said something – and I didn't ascribe this to the prosecutor because I didn't see it. I just saw him using it as a term of art. But if you're going to say that means that he's got six colors, we would be very offended. And it would bother us that that word was used synonymously with that. It's an outdated, archaic, and no longer accepted method to describe that racial minority. If the court would allow me, I know I'm sort of going on time. Why don't you address your next issue? Thank you, Judge. The next issue is that in this case, the defense wanted to present a third party suspect or some alternate suspect. And that theory that they wanted to present was predicated on the fact that the day of this shooting, the very same day of this shooting, at the very same address of this shooting, another shooting took place. Literally, I think it's in dispute as to whether it's five hours earlier or six hours earlier, but you're talking within that span, five to six hours. Another shooting took place. The defendants wanted to get into that other shooting to present an alternative suspect. And that alternative suspect went by the name of Ron Crump. Ron Crump happened to be identified by their witnesses as being at the first shooting, being one of the gunmen at the first shooting. And then also later, five or six hours later, Ron Crump was also at the scene of this second shooting. The defense, after arguing a motion of no-nay brought by the state to prohibit that evidence. What was the point for the second shooting? I apologize. What was the point for the second shooting? If they had shown, what, that Ron Crump was at the second shooting and was the second shooter? Great, great, great question, Judge. The point is that Ron Crump had already committed a shooting at the same exact location five hours prior to this, and he came back for a second thing. But the witness who saw him the first time also is the witness who had the best look at the defendant in that case. Her testimony is the key. She had witness testimony. She says it was Williams. Yeah, but I would argue, Your Honor, that she had a lot of flaws in her identification of that particular incident. The flaws, if you look at the pretrial motions and the things they wanted to bring up when they were cross-examining Nikita Davis, which is the witness that I believe Your Honor is talking about, she at one point in time identifies somebody else, a sixth shooter, excuse me, a sixth position in a photo array as a second shooter and says, this is a person that's trying to struggle to get his gun out of his waist prior to the shooting. Then she says, no, I don't even recognize that guy. I didn't even see him that day. And it was this other person who she then identified as Thunder Williams as being the individual that withdrew his gun or was struggling to withdraw his gun from this. I would caution Your Honor against putting an over amount of emphasis on Nikita Davis. And the reason I would do that, and Judge, going back to your issue as to why does it matter, Nikita Davis had been shot at, ostensibly, five, six hours prior to this by Juan Crump. Then she sees Juan Crump drive by her house minutes before the second shooting and acts as if nothing happened. At least that's the story that we're expected to believe, as if nothing occurred in any way, shape, or form. There he is. Does it inform the people that are standing there? Wouldn't that give her a motive to identify him as being a participant in the second shooting? I think so. Or she could have given her a motive to be afraid of Juan Crump and identify somebody else. Now, wasn't this brought in front of the jury sufficiently? I don't believe they were allowed to get into the first shooting at all. Right. But Crump's name was brought up at the trial, wasn't it? Right. And, unfortunately, without that prior information about him being involved in the first shooting, it doesn't give the jury any understanding of why that would have affected her in any way, shape, or form, why that motivation would have existed. Matter of fact, the fact that there was a first shooting gives Juan Crump a motive to be back there. He didn't succeed in the first one. Wasn't there an offer of proof at the trial? Yes, Judge. I think not at the trial, but I think at the pre-trial motion when the defense went extensively into why they wanted to do this. Right. But the witness wasn't there at that time, correct? And the witness was there at trial, and perhaps if they would have asked the judge to conduct an offer of proof outside the presence of the jury, perhaps they might have been able to illuminate the situation so that the judge perhaps might have had a different perspective. That is always a very effective way of doing it. I think there were a series of arguments made before the court, and arguments were dealing with that particular issue. Do you think enough was there for the court to do? I do. I think that the judge had actually more information than usual. I would say that she had every bit of information.  When I say an error, I think she had mistook what the defense was trying to do in bringing up that information that we're discussing. She tried to correct it, but she had done that attempt to correct it. It deals with my third issue that I really wasn't going to touch too much on, but the attempt to correct it, I would argue, still did not correct it because it was not during cross-examination. It was not contemporaneous with these issues being brought up by the heated- Oh, I'm sorry. Go ahead. Just wrap up, please, so we can move on. Absolutely, Judge. I want to thank the court. I do want to say that I think that the Batson issue does have some merit. I think the court should examine it in light of the fact that Hooper v. Ryan does not limit us only to getting this broad view, and I would also ask the court to take a look at that third-party suspect because I think it's important. All right. Thank you very much. Mr. O'Brien. Good morning, Your Honors. May it please the court. The Circuit Court correctly found no prima facie case of discrimination under Batson. The totality of the facts and circumstances reflected in the record affirm that ruling by the Circuit Court. Notwithstanding the finding of the trial court, doesn't it present a problem for you that four blacks are excluded from the jury? Your Honor, I think on the surface of it, yes, it looks peculiar, but you have to keep in mind as well that- It looks a little more than peculiar, counsel. Well, Your Honor, I think if you look at it, only insofar as saying that there were four African-Americans excluded within the time frame, within the first panel, it looks like it's an intensified- Four of the seven preemptory challenges that they had. Why are they using all their preemptory challenges against blacks? Well, Your Honor, at this stage, you can look at perhaps what characteristics did these individuals share other than race. There are a lot of things we can look at, counsel. I just want to make it clear that I'm just a little troubled by this. Sure, Your Honor. I mean, in here, when you look at what commonalities these people had, I mean, you had that they were teachers, graduate-level education. And that was the justification for exclusion? Well, Your Honor, I'm looking at the record. I'm not sure, and there wasn't a hearing. It was a second-step hearing as to whether or not that was, in fact, what justified the prosecutor's decision in striking. And if you look at it in the second and third rounds, we used two more strikes, both against teachers. We struck an alternate who was a professor, and we struck another person who was an art teacher. So there seemed to be a pattern in what we were doing. And as what I discussed in my brief is that when you look at the tighter your pool of your sample that you're looking at in a Batson case, your statistics may become, can create a false impression because they may not have a wide enough pool to have enough power and significance to create reliable statistics. What do we have in the statistics, then, of the first 14? Could we know for the first 14? For the first 14, we know because it's established. And the statistics for those was? On the first 14, we can take, I guess, two out were excluded by cause. And then so we have of the 12 that were eligible jurors, we have four people that were selected to sit on the jury, one of which was African-American. The other people that were struck by the defense, I assume they were not African-American. I'm not sure what their actual race was. So five of the 12, almost half. Pardon? Five of the 12 people were African-American, we know. Correct. Which is almost half. It's almost half, yes. And, or looking another way, seven, of the seven, do we know whether any of them were non-Caucasian and non-African-American? Your Honor, do we know exactly what their race was of the other seven? I think we only know one. I think we know that the first person that we used a preemptory on was Caucasian. It was Craig Holm. I think his race was put in the record. That was our first preemptory strike, and we know that that person was Caucasian. In fact, that was put in the record. I do not know. Wouldn't it be a good idea when one of these challenges is made to ensure that the defendant gets a fair trial, to have the judge take the jury summons and make them a part of the record and make an indication on the cards as to the race of the people that are being challenged so that this court has a complete record and can make a decision? You know, I have to agree with the state. The record's incomplete. I have to agree. Yeah, I really don't know what is the best solution to ensure that we have adequate records for review. What Your Honor proposed could be one. I think another thing as well is that defense counsel renews the objection at the end of whatever and makes a full record. But what we really need is information on the jurors, and that summons provides us with some of the information that would assist us in making a decision. But proceed. Sure. Your Honors, as far as looking at the other facts and circumstances, excuse me, under Datsun that we can look at, the case itself, there's no racial implications internally inside the case. The defendant and the victim, as far as we know, are both African Americans, and there's no evidence that the witnesses differed racially from the defendant. There's no statements that the prosecution made during Valdero while exercising their strikes that suggest racial motives. And, Your Honors, as far as establishing a pattern of strikes, here we know that there were four African Americans that were struck, but the record does not affirmatively establish how many African Americans were available in the veneer but were not struck. So on that, Your Honors, again, there's not a sufficient record to develop it, so there is no pattern analysis that can be reliably undertaken in this case. As to the second issue, unless Your Honors have any more further questions on Datsun, on the second issue, the court did not abuse its discretion in its ruling on the eliminate motion, limiting references to the first shooting as an incident only. That's really for two reasons. The ruling did not imperative the defendant's ability to develop an alternate suspect theory. There was no evidence that anyone that was involved in the first shooting was actually a suspect in the second shooting. And I don't recall that the defendant ever, at the trial stage, specifically identified Juan Crump as who their alternative suspect would be, and that's what they wanted to use the evidence of the first shooting for. The court said it was prejudicial to the defendant. How is that prejudicial to the defendant? Well, Your Honors, I think it could be because the State moved for it. I think the State could have been hoping to preserve the record against an ineffective assistance of counsel claim later. The State's claim of help to the defendant. Well, I'm not saying that's entirely uncommon, but if you're trying to preserve a record. I mean, you do have... But the judge said prejudiced. This is going to be... Okay, that's how she reasoned it. Where is the prejudice? Explain. Well, I can explain it, Your Honors. So you have testimony at trial that Juan Crump and the defendant are friends, right? I think Nikita Davis testifies that she had seen them together over the years. So you have a friendship between them, and Juan Crump is the suspected shooter in the first incident. So you have a connection, a friendship, between the defendant and Juan Crump in the first shooting. So I think that can very much carry over. It may be prejudicial to Crump, but how is that prejudicial to Williams? Because his friend was just involved in a shooting, and I think that he could be seen as carrying out what his friend did incomplete the first time around. Well, maybe he was... So there's no connection between the two people? I could say yes, that there's really no prejudice. But there is a connection between the two. Well, it's sort of ironic because we frequently get criminal cases up here where the state introduces earlier shootings where the defendant on trial had mere acquaintance with the participants in the earlier shooting, and they want to introduce the earlier shooting as motive for the second shooting, that the defendant on trial isn't even connected to. So it's somewhat refreshing to hear you... ...protection of the defendant on trial from possible prejudice of an earlier shooting that may not have been relevant to the shooting again. Somewhat complicated, but that's how these things go. Your Honors, as far as the second part of his relevancy argument, it's that the defendant wanted to produce this evidence so they could show that Nikita Davis would have been in a more excited state or panicking when she saw Juan Crump drive by. There's no testimony in the record at all suggesting that anybody was panicking or that their reactions were of concern when they saw the car drive by with Juan Crump in it later in the afternoon. Well, there is, because I forget the exact phrase she used, but it was the eyes, something... The mugging. The mugging. Which was, it's not a good way to look at somebody. It's a scary way to look at you. Oh, sure. So there was... Yeah, but I think as far as their reaction goes, and as far as what they're saying weighs on the identification, you didn't have people flee the porch. They, in fact, stayed out there. And Nikita Davis testified that the only reason she went into the house was because her mom asked her to come in and shut down the computer.  There didn't seem to be any evidence of panicking. This could have been just another... Obviously, there's not a... I mean, they see him drive by, but it didn't elicit the response that is being suggested on appeal that somehow this would have affected her identification later. So those reasons, Your Honor, we ask that you affirm the defendant's conviction and sentence. Thank you. Counsel? Judge, I'm going to keep this short because I think you've asked a lot of great questions. Your Honor referenced the method or methodology to try and avoid these kinds of situations, us coming back before Your Honors with an ambiguous or incomplete record. And I think that was the attempt that Batson was trying to do is to eliminate some of these situations. I do think there is a better method that once they've got some challenges made, especially with regards to a specific demographic group, that that should be made available and preserved in some manner. I also would caution... Not caution. I would also ask the court that in regards to that second issue, the court was asking about mean-mugging and her reaction to that mean-mugging or the glaring with mean intent. The jury was left with no way to gauge that because they weren't allowed to hear about the first shooting that Lana Crump was involved in. So the jury is left with an inaccurate view of whether she could be believed in looking at a car of someone who just shot at her and not having any reaction, not warning anyone, not calling the police. So I think that the credibility question is left for the jury but without adequate information, without an ability to gauge whether that was in fact true. And having said all that, Judge, I again think that that second issue does present the court with some problems because it was a relevant thing. It wasn't too remote in time. It wasn't too speculative. All the issues that go around whether that evidence is admissible are basically relevancy issues. And the case law that surrounds this area does not seem to indicate that an earlier argument in this particular situation, an earlier shooting, is too remote in time to prohibit the admission of third-party suspects. Thank you. Thank you. On behalf of the court, we thank the parties for their excellent briefs on an interesting number of issues. The court will take this matter under advisement and we will be in recess until this afternoon for our 3 o'clock argument. Thank you.